**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| Tysinger Motor Company, Inc. d/b/a Tysinger Dodge<br><br>             Plaintiff,<br><br>v.<br><br>Chrysler Group, LLC,<br><br>              Defendant. | Civil Action No. 3:10-cv-554-RLW |

**CHRYSLER GROUP LLC'S OPPOSITION TO TYSINGER MOTOR COMPANY, INC'S MOTION TO STAY ENFORCEMENT OF AN ARBITRATION AWARD**

The Court should deny the Motion of Tysinger Motor Company, Inc. ("Tysinger") to Stay Enforcement (the "Stay Motion") of what it describes as an arbitration award in favor of Chrysler Group LLC ("Chrysler") against Tysinger.

Tysinger's Stay Motion does not seek a stay of an arbitration award but rather seeks to interfere with the rights of non-parties to the underlying arbitration. It bases this request for extraordinary relief upon incorrectly-stated and inapplicable authority. Neither the Federal Arbitration Act ("FAA") generally, nor Section 12 in particular, governs this request to interfere with the rights of a non-party to a compelled arbitration. Federal Rule of Civil Procedure 65 is also inapplicable to a stay motion, and in any event, Rule 65 imposes a rigorous standard that Tysinger misstates and cannot satisfy. Tysinger's Stay Motion does not, and cannot, justify the issuance of such a "stay," and should therefore be rejected.

## I.     Facts

As set forth more fully in Chrysler's Opposition to Tysinger Motor Company, Inc.'s Motion to Vacate Arbitration Award and Proposed Order Granting Stay of Arbitration Award

(the "Opposition" or "Opp."), Tysinger is an automotive dealership in Hampton, Virginia, which formerly sold Dodge brand vehicles pursuant to a sales and service agreement with Chrysler LLC ("Old Chrysler").

On June 9, 2009, as part of Old Chrysler's bankruptcy, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an order authorizing Old Chrysler to reject agreements with certain dealers, including Tysinger, in an effort to avoid Old Chrysler's immediate liquidation. Prior to bankruptcy, Old Chrysler had been pursuing a plan called "Project Genesis," with the goal of creating a smaller dealer network with consolidated dealers each selling the full line of Chrysler, Jeep, and Dodge vehicles from well-located, attractively "branded," and exclusive facilities. Tysinger was one of approximately 800 dealers which the Bankruptcy Court authorized Old Chrysler to reject. When Chrysler then purchased selected assets from Old Chrysler as part of the bankruptcy, the rejected Tysinger dealer agreement was excluded.

On December 16, 2009, as a result of an intensive lobbying effort by certain rejected dealers, Congress enacted Section 747, which required Chrysler[1] to submit to binding arbitration to determine whether certain dealers whose dealership agreements had been rejected as part of the Old Chrysler bankruptcy should be added to Chrysler's dealership network. *See* Ex. B (Section 747(b)).

Section 747 provided as follows:

> A covered dealership that was not lawfully terminated under applicable State law on or before April 29, 2009 [the day before Old Chrysler's bankruptcy filing], shall have the right to seek, through binding arbitration, continuation, or reinstatement of a franchise agreement, or to be added as a franchisee to the dealer

---

[1]     Section 747 also applied to General Motors, which, like Old Chrysler, declared bankruptcy in 2009.

> network of the covered manufacturer in the geographical area
> where the covered dealership was located when its franchise
> agreement was terminated, not assigned, not renewed, or not
> continued.

Section 747(b).

Section 747 defined a "covered manufacturer" to include Chrysler; and a "covered

dealership" to include dealers whose dealer agreements were rejected by order of the Bankruptcy

Court.

After balancing the economic interests of Chrysler, the public at large and the rejected

dealer, and considering seven factors enumerated in the statute, the arbitrator was required to

decide only "whether or not the covered dealership should be added to the dealer network of the

covered manufacturer." Section 747(d). The arbitrator was not vested with any further authority

after determining whether or not the covered dealership should be added to the dealer network of

the covered manufacturer. The sole and exclusive remedy provided by Congress in the event the

arbitrator found in favor of the dealer was the award of the covered manufacturer's customary

and usual letter of intent to enter into a sales and service agreement. Section 747(e).

On January 20, 2010, Tysinger demanded arbitration pursuant to Section 747. Section

747 provided for the AAA to administer the selection of arbitrators. Section 747(e). Tysinger

and Chrysler participated in a confidential arbitrator selection process, through which both

parties ranked the arbitrators they preferred and the AAA assigned the arbitrator ranked highest

by both parties. On March 8, 2010, the AAA appointed Roderick B. Mathews, Esq. as arbitrator.

Mr. Mathews scheduled a two day hearing for June 29 and 30, 2010.

Tysinger and Chrysler submitted witness disclosures, as called for by the AAA, which

included certain witnesses from non-party Pomoco Auto Group, the parent company of Pomoco

Chrysler Jeep of Hampton ("Pomoco Hampton"), an automotive dealership in Hampton,

Virginia, that sells Chrysler and Jeep vehicles pursuant to its sales and service agreements with Chrysler.  During its bankruptcy, Old Chrysler, pursuant to Bankruptcy Court approval, assumed and assigned the Pomoco Hampton dealer agreements to Chrysler in connection with Chrysler's purchase of substantially all of Old Chrysler's assets.

After reviewing the parties' fact witness lists, Mr. Mathews informed the AAA that Mr. Adams, disclosed on Chrysler's fact witness list as a principal of the Pomoco Auto Group, "is project manger for a residential real estate development in Surry County, Virginia known as 'Cypress Creek' that my father-in-law Max C. Kurbjun has an ownership interest in that he has assigned to his daughter Karla Kurbjun Mathews, my wife, and to me."  Mr. Mathews stated that he was not acquainted with Mr. Adams and that neither he nor his wife was involved in the real estate development beyond the assigned interest.  Mr. Mathews stated that he has "no preconceptions about Mr. Adams as a witness and that the business relationship will have no effect whatsoever on [his] capacity to act as a neutral third party arbitrator in this dispute."  *Id.*

On June 23, 2010, a mere six days before the scheduled hearing, Tysinger objected to Mr. Mathews' continuing to serve as arbitrator in the dispute and asked the AAA to disqualify him. Chrysler responded to Tysinger's objection, noting that "Mr. Mathews has no interest, even contingent, in the Pomoco dealership, only in an unrelated real estate development," and concluding that "[t]hese facts do not suggest, let alone establish a conflict of interest."

After hearing from both parties, the AAA informed the parties that "[a]fter careful consideration of the parties' contentions, the Association has determined that Mr. Mathews will be reaffirmed as an arbitrator in the above matter."   After Tysinger requested AAA reconsider its position, AAA "reaffirmed" Mr. Mathews' appointment.

Beginning on June 29, 2010, Mr. Mathews presided over a two-day hearing.  Tysinger had a full and fair opportunity to present its case.  Tysinger called four witnesses live, including two experts, and introduced over a thousand pages of documentary evidence, including eight sworn affidavits.  Tysinger also cross-examined all four of Chrysler's witnesses.

On July 22, 2010, after the parties submitted post-hearing briefs, Mr. Mathews issued a fifteen-page written determination (the "Written Determination") in which he concluded that Tysinger "failed to sustain its burden of proof and its request to be added to Chrysler's Dodge dealers network is denied."[2]  The Written Determination did not grant any "relief" to Chrysler— indeed, pursuant to Section 747, no such relief was available.  Nor did the Written Determination in any way determine any rights or obligations between Chrysler and Pomoco Hampton, which was not a party to the arbitration or a "covered dealership" under Section 747.  Instead, the Written Determination merely denied Tysinger's request to be added to Chrysler's dealer network.

On August 9, 2010, almost a month after the expiration of Section 747 on July 14, 2010, Tysinger served on Chrysler a motion to vacate the arbitrator's determination in reliance on the FAA.  *See*, *e.g.*, Tysinger Motion to Vacate Arbitration Award Pursuant to 9 U.S.C. § 10 (hereinafter "Vacate Mot.") at 8.  Included in that motion's prayer for relief is a request for an order "staying the effect of the arbitration award . . . pending the outcome of this motion, a sketch of which is filed herewith pursuant to 9 U.S.C. § 12."  Vacate Mot. at 10.  The attached proposed order, which again draws upon "the power vested in the Court by 9 U.S.C. § 12,"

---

[2]      Mr. Mathews' determination was consistent with rulings in the majority of arbitrations under Section 747, which denied the rejected dealers' requested relief in approximately 70% of all cases.

would prohibit Chrysler from "[t]aking any action to give effect to the arbitration ruling . . . until further Order of this Court."  Vacate Mot. Proposed Order at 2.

Nine days later, on August 18, 2010, Tysinger filed a separate Memorandum in Support of its Motion to Stay Enforcement (the "Stay Memorandum" or "Stay Mem.") of the arbitration award, setting forth—for the first time in any detail—the alleged factual basis for Tysinger's motion for a stay.

## II.    Argument

### A.    Tysinger's Proposed Relief Extends Well Beyond a Stay of an Arbitration Award

Section 747, which governed the Tysinger-Chrysler arbitration, provided for one and only one form of relief—"[i]f the arbitrator finds in favor of a covered dealership, the covered manufacturer shall . . . provide the dealer a customer and usual letter of intent" to be "added to the dealer network of [Chrysler]."  Section 747(d) and (e).  The statute did not provide for any affirmative relief to be granted in Chrysler's favor, and in the event that an arbitrating dealer failed to satisfy its burden of proof under the statute, the only result was a denial of the dealer's demand to be added to Chrysler's dealer network.  *See* Section 747(e).[3]

Section 747's procedure and relief were circumscribed for good reason.  Congress was legislating against the backdrop of the financial collapse and bankruptcy of two iconic American car makers.  The legislation was crafted to provide for a rapid—and final—hearing of each rejected dealership's case that would allow GM and Old Chrysler to put the bankruptcies behind them and rejected dealerships, if they won, the opportunity to be added to Chrysler's dealer

---

[3]     Section 747 included a number of other provisions that made clear that Congress intended a focused and expeditious process, including the requirement that each and every case be submitted to an arbitrator within only 180 days, Section 747(d), and that the arbitrator issue a written determination only 7 business days after submission.  Section 747(e).

network.  Congress knew that it could have provided for additional remedies, including remedies

in the event that the arbitrator ruled in Chrysler's favor, but it did not—and it omitted such

remedies intentionally.[4]

Considered against this background, Tysinger's Stay Motion seeking an "order staying

the effect of the arbitration award" in the Tysinger-Chrysler arbitration, Vacate Mot. at 10, is

incomprehensible.  The only "effect of the arbitration award" permitted under Section 747 was

that Tysinger was not added to Chrysler's dealer network.  Nowhere does Tysinger explain how

this "effect" could possibly be stayed, as Tysinger is not and has never been a dealer for

Chrysler.  Put simply, because the arbitrator's ruling simply denied Tysinger's request for relief,

there is nothing to stay.[5]

Faced with this conundrum, Tysinger devotes most of its Stay Memorandum to

discussing alleged dealings between Chrysler and Pomoco Hampton.  Stay Mem. at 2-3.  The

Written Determination had no effect on Pomoco Hampton.  Pomoco Hampton was not a party to

---

[4]      *See Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164, 176-77 (1994)
(although "Congress knew how to impose aiding and abetting liability when it chose to do so," it
did not use the words "aid" and "abet" in the statute, and hence did not impose aiding and
abetting liability); *see also Franklin Nat'l Bank v. New York*, 347 U.S. 373, 378 (1954) (finding
"no indication that Congress intended to make this phase of national banking subject to local
restrictions, as it has done by express language in several other instances"); *Meghrig v. KFC
Western, Inc.*, 516 U.S. 479, 485 (1996) ("Congress . . . demonstrated in CERCLA that it knew
how to provide for the recovery of cleanup costs, and . . . the language used to define the
remedies under RCRA does not provide that remedy"); *FCC v. NextWave Personal Comm'ns,
Inc.*, 537 U.S. 293, 302 (2003) (when Congress has intended to create exceptions to bankruptcy
law requirements, "it has done so clearly and expressly"); *Dole Food Co. v. Patrickson*, 538 U.S.
468, 476 (2003) (Congress knows how to refer to an "owner" "in other than the formal sense,"
and did not do so in the Foreign Sovereign Immunities Act's definition of foreign state
"instrumentality"); *Whitfield v. United States*, 543 U.S. 209, 216 (2005) (Congress has imposed
an explicit overt act requirement in 22 conspiracy statutes, yet has not done so in the provision
governing conspiracy to commit money laundering).
[5]      Even the authority cited by Tysinger demonstrates that its requested relief is not truly a
"stay," which "simply suspends judicial alteration of the status quo."  *Nken v. Holder*, __ U.S.
__, 129 S. Ct. 1749, 1758 (2009).  The Written Determination did nothing to alter the status quo.

the Tysinger-Chrysler arbitration, nor was Pomoco Hampton a "covered dealership" under

Section 747.  Section 747(a)(2).  Chrysler has and has always had the right to enter into an

agreement to sell Dodge vehicles at Pomoco Hampton—that right was not a "result[]" of the

Written Determination.  *See* Stay Mem. at 6.  Tysinger's suggestion otherwise (as, for example,

its suggestion that Chrysler's attempts to establish a Dodge dealership with Pomoco Hampton is

an action to "enforce the arbitration ruling" (Stay Mem. at 6)) is simply incorrect, and contrary to

the clearly limited remedies provided for by Section 747.  *See* Section 747.

To the extent that Tysinger's Stay Motion seeks relief that would extend well beyond

simply staying enforcement of the Written Determination and interfere with the rights of Pomoco

Hampton, a non-party to the arbitration, Tysinger offers no evidence or argument to justify such

far-reaching and extraordinary relief.  *Muhammad v. Warden, Baltimore City Jail*, 849 F.2d 107,

113 (4th Cir. 1988) ("a stay may not be immoderate in extent nor oppressive in its

consequences").

### B.      Tysinger's Purported "Stay" is Not Authorized by Section 12 of the FAA

Tysinger's Stay Motion is ostensibly based on Section 12 of the FAA.  *See* Vacate Mot.

at 10.[6]  As explained more fully in Chrysler's Opposition, the FAA does not apply to the Section

747 arbitrations, which were statutorily-mandated and therefore beyond the scope of the FAA.

In any event, neither the FAA generally, nor Section 12 in particular (even if the FAA did apply),

provides any authority for Tysinger's proposed stay.

Section 747 nowhere provides for the application of the FAA, nor could it.  The FAA

governs consensual arbitrations pursuant to a written agreement between the parties and does not

apply to the unique, mandatory brand of arbitration compelled by Section 747.

---

[6]      Tysinger's Stay Memorandum makes only passing reference to Section 12, see Stay
Mem. at 1, and does not in any way discuss the standards or requirements imposed by Section
12.

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or ***an agreement in writing to submit to arbitration*** an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.[7]

9 U.S.C. § 2 (emphases added).

Courts have made clear that the FAA only applies to consensual arbitrations, undertaken by written agreement.  "Arbitration under the Act is a matter of private contract."  *Glass v. Kidder Peabody & Co., Inc.*, 114 F.3d 446, 451 (4th Cir. 1997); *see also EEOC v. Waffle House, Inc.* 534 U.S. 279, 294 (2002) ("[T]he FAA is 'at bottom a policy guaranteeing the enforcement of private contractual arrangements.'"); *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989) ("Arbitration under the [FAA] is a matter of consent, not coercion."); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985) ("The legislative history of the Act establishes that the purpose behind its passage was to ensure judicial enforcement of privately made agreements to arbitrate."); *MCI Telecomm. Corp. v. Exalon Indus., Inc.*, 138 F.3d 426, 430 (1st Cir. 1998) ("section 12 . . . of the FAA, do[es] not come into play unless there is a written agreement to arbitrate").

The arbitration between Chrysler and Tysinger took place pursuant to Section 747, a federal statute that compelled Chrysler's participation in binding arbitrations with any of the rejected dealerships that demanded it.  Tysinger does not allege (because it cannot) that Chrysler and Tysinger entered into an agreement to submit to the arbitration.  Chrysler and Tysinger have

---

[7]     Section 4 states that a proceeding under the FAA "shall be dismissed" if no "agreement in writing for arbitration" exists.  *Id.* at §4 ("If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed.").

never agreed to arbitrate any disputes between them—indeed they have never been a party to a contractual agreement of any kind or, for that matter, ever had a commercial relationship. Where, as here, there is no private contractual arbitration agreement between Tysinger and Chrysler to be enforced, the FAA simply does not apply.

More specifically, even if the FAA applied generally to arbitrations under Section 747, Section 12 is entirely inapplicable to this action. Section 12 of the FAA provides:

> For the purposes of the motion any judge who might make an order to stay the proceedings in an action brought in the same court may make an order, to be served with the notice of motion, ***staying the proceedings of the adverse party to enforce the award***.

9 U.S.C. § 12 (emphasis added). Even by its own terms, Section 12 only authorizes a Court to stay parallel proceedings in which the adverse party to the arbitration is seeking to enforce an arbitration award. *See Marsillo v. Geniton*, No. 03-CV-2117, 2004 WL 1207925, at *4 (S.D.N.Y. June 1, 2004) (under Section 12, "[a] stay of proceedings to confirm an arbitration award is contemplated only in order to permit consideration of motions to vacate, modify or correct an award"). Chrysler has brought no such motion, and therefore there are no proceedings of the adverse party to enforce the award for this Court to stay.[8]

---

[8]     Even if they were applicable, neither the FAA generally nor Section 12 specifically authorizes Tysinger's motion for a "stay" that would greatly exceed the scope of the underlying arbitration. Even in those cases where parties have a written agreement to arbitrate, the FAA merely governs "[t]he rights and responsibilities of the parties with respect to the arbitration agreement." *Patten Grading & Paving, Inc. v. Skanska USA Building, Inc.*, 380 F.3d 200, 204 (4th Cir. 2004). Nothing in the statute "authorizes a court to compel arbitration of any issues, *or by any parties*, that are not already covered." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l. Corp.*, __ U.S. __, 130 S. Ct. 1758, 1774 (Apr. 27, 2010) (emphasis in original). An arbitration proceeding under the FAA is not a "general charter to administer justice for a community which transcends the parties." *Id.* Even by its own, inapplicable terms, the FAA would not govern or authorize a form of relief restricting the rights and obligations of non-parties.

### C.       Tysinger's Purported "Stay" is Not Authorized by Rule 65

Tysinger concedes that Federal Rule of Civil Procedure 65 does not apply (Stay Mem. at 7) and then, inexplicably, purports to apply Rule 65 to its unsupported allegation.  Tysinger is correct; Rule 65 does not apply to a motion seeking a stay.  *Nken*, 129 S. Ct. at 1761 (acknowledging that standards for stay and preliminary injunction are not "one and the same").  Even if it did, Tysinger misstates Rule 65's rigorous standard, a standard which Tysinger cannot satisfy.

As the party requesting a stay, Tysinger "bears the burden of showing that the circumstances justify" a stay.  *Nken*, 129 S. Ct. at 1761.  In particular, a "party seeking a stay must justify it by clear and convincing circumstances outweighing potential harm to the party against whom it is operative."  *Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983); *see also Aventis Pharma Deutschland GMBH v. Lupin Ltd.*, 403 F. Supp. 2d 484, 489 (E.D. Va. 2005) (same); *ePlus, Inc. v. Lawson Software, Inc.*, No. 09-CV-620, 2010 WL 1279092, at *1-2 (E.D. Va. Mar. 31, 2010) ("the party seeking a stay must make out a 'clear case of hardship or inequity in being required to go forward'") (*quoting Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936)).

Even if it were instructive, however, Rule 65 does nothing to save Tysinger's Stay Motion.  Rule 65 applies strict requirements to the party seeking the "extraordinary remedy" of preliminary injunctive relief.  *Real Truth About Obama, Inc. v. Federal Election Comm'n.*, 575 F.3d 342, 345 (4th Cir. 2009), *reaff'd after remand* 607 F.3d 355, 355 (4th Cir. 2010).  The party seeking relief "must demonstrate by a clear showing . . . [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of [requested] relief, [3] that

the balance of equities tips in his favor, and [4] that [the requested relief] is in the public interest." *Id*. at 346.[9] Tysinger fails to satisfy this burden.

### 1.      Tysinger is Not Likely to Prevail on the Merits

A party seeking a stay must demonstrate a likelihood that it will prevail on the merits of its motion. *Nken*, 129 S. Ct. at 1761; *see also Real Truth*, 575 F.3d at 346.  In so doing, the moving party must show "more than a mere possibility of relief." *Nken*, 129 S. Ct. at 1761; *Real Truth*, 575 F.3d at 347 (requiring that "the plaintiff clearly demonstrate that it will *likely succeed on the merits*") (emphasis in original).

As set forth in more detail above and in Chrysler's Opposition, Tysinger's scant Motion to Vacate is not authorized by the FAA and, in any event, fails to satisfy the FAA's rigid requirement for vacating an arbitration award.  Opp. at 7-17.  In particular, Tysinger's motion suffers from at least six fatal defects:

*First*, Section 747—which governed the Tysinger-Chrysler arbitration—provides this Court with no jurisdiction to vacate a determination by the Section 747 arbitrator.  Section 747 set forth a mechanism for administering the selection of arbitrators using the AAA, a neutral organization with no interest in the outcome of the arbitration.  Opp. at 9.  Tysinger twice raised its baseless bias allegations before the AAA, and twice the neutral AAA determined that no such bias existed.  Id. at 10.  Nowhere does Section 747 provide for judicial review of arbitrator selection, nor does it the statute provide for any rights to vacate the determinations of arbitrators. Opp. at 9.  Accordingly, Tysinger's Motion to Vacate is without statutory basis.

---

[9]      Tysinger's Stay Memorandum summarized this test (Stay Mem. at 7) by citing the outdated *Blackwelder* formulation, since abandoned by the Fourth Circuit.  *Real Truth*, 575 F. 3d at 347 ("the *Blackwelder* balance-of-hardship test may no longer be applied in granting or denying preliminary injunctions in the Fourth Circuit").  Tysinger's Memorandum omits entirely any discussion about irreparable harm, and similarly mis-states that the mere "risk of harm" to the moving party is sufficient to support relief.  *See* Stay Mem. at 7.

*Second*, as discussed in more detail above, the FAA is inapplicable to non-consensual arbitrations under Section 747.  Opp. at 10-11.  Accordingly, Tysinger has failed to identify any statutory basis for vacatur.

*Third*, Tysinger's scant allegations of bias are insufficient to satisfy its "'heavy' and 'onerous' burden" to vacate the Written Determination.  Opp. at 11 (*quoting ANR Coal Co., Inc. v. Cogentrix N.C., Inc.*, 173 F.3d 493, 501 (4th Cir. 1999)).  Tysinger has failed to offer any facts to support its conclusory argument that any such bias existed, let alone sufficient evidence to satisfy the strict review required for vacatur.  Opp. at 12-13.  Instead, Tysinger relies entirely upon two affidavits from Mark Tysinger, neither of which identifies any facts about Mr. Mathews' alleged bias that are within Mr. Tysinger's personal knowledge.  *Id*.  This speculation, information and belief is not sufficient to establish a likelihood of success, Opp. at 13-14, especially when Tysinger has not indicated that no further evidence is forthcoming.  Stay Mem. at 12 ("Tysinger is not seeking discovery").[10]

*Fourth*, Tysinger has failed to establish any evidence establishing "the extent and character of the personal interest, pecuniary or otherwise," of Mr. Mathews.  Opp. at 14-15 (*quoting ANR Coal*, 173 F.3d at 500).  Tysinger offers no evidence to suggest that Mr. Mathews had any personal interest whatsoever in the outcome of the Tysinger-Chrysler arbitration.  *Id*. There is no evidence that the value of Mr. Mathews' interest would vary at the discretion of the "Pomoco principals," no evidence that the "Pomoco principals" benefit "the most from the arbitration award," and no evidence that (even if Pomoco Hampton would benefit) a Written Determination in favor of Chrysler would in any way benefit *Cypress Creek*, the entity in which

---

[10]     Tellingly, Tysinger's Stay Memorandum concedes that it "is **entirely unclear** how the profits of Cypress Creek," the **only alleged link** between Mr. Mathews and this arbitration, "are distributed."  Stay Mem. at 6 (emphasis added).

Mr. Mathews has an alleged interest.  *Id.*  More fundamentally, Tysinger offers no evidence (or even argument) explaining why Mr. Mathews' alleged interest in a percentage of profits of Cypress Creek—a real estate development owned by non-parties to the arbitration—translates into a personal interest in the proceedings between Tysinger and Chrysler.  Opp. at 15. Accordingly, Tysinger has failed to satisfy the first *ANR Coal* factor, and success on the merits is not likely.

*Fifth*, Tysinger has failed to demonstrate "the directness of the relationship between the arbitrator and the party he is alleged to favor."  Opp. at 15 (*quoting ANR Coal*, 173 F.3d at 500). Mr. Mathews has no relationship, and Tysinger has not even alleged one, with Chrysler, the party that Mr. Mathews is alleged to have favored.  *Id.*; *see also* Vacate Mot. at 8.  At most, Tysinger has alleged that Mr. Mathews had an interest in Cypress Creek, a real estate development that was not a party to the Tysinger-Chrysler arbitration.  Vacate Mot. at 8-9. Cypress Creek's status as a non-party to the arbitration (at least three layers removed from the actual parties to the arbitration) is itself fatal to its motion.  Opp. at 15 (*citing ANR Coal*, 173 F.3d at 501).

Tysinger's allegations have nothing to do with the relationship between Mr. Mathews and Chrysler.  Instead, Tysinger alleges that the Written Determination in favor of Chrysler may indirectly benefit non-party Pomoco Hampton, a new car dealership which is itself a subsidiary of a holding company, Pomoco Developments, which in turn owns one percent of Cypress

Creek, in which Mr. Matthews allegedly has an interest.  Opp. at 15-16.[11]  Tysinger's allegations also depend on the unsubstantiated assumption that an indirect and speculative benefit to the parent car dealership would somehow result in more profits for subsidiary's real estate development, simply on the basis of common ownership.  Accordingly, Tysinger has failed to satisfy the second *ANR Coal* factor, demonstrating the unlikelihood of success on the merits.

*Finally*, Tysinger has failed to demonstrate the connection between any alleged interest and the arbitration.  Opp. at 16 (*quoting ANR Coal*, 179 F.3d at 500).  Tysinger baselessly asserts that Pomoco Hampton is "the primary beneficiary of a ruling in favor of Chrysler."  Vacate Mot. at 6.  Again, as set forth above, nothing in the Written Determination directly benefited Pomoco Hampton, let alone Cypress Creek—contrary to Tysinger's assertion, the Written Determination did not direct that Pomoco Hampton "gain the franchise rights that were taken from Tysinger." *Id*.  Chrysler has always been free to enter into franchise agreements to sell Dodge vehicles with whomever it pleased, be it Pomoco Hampton or anyone else.  The primary beneficiary of Mr. Mathews' determination preserving this flexibility against Tysinger's demand to be added to the dealer network was plainly Chrysler, the party to the arbitration.  Opp. at 16.  Tysinger has therefore failed to establish a connection between a relevant relationship ("between the arbitrator and the party he is alleged to favor") and the arbitration.  Opp. at 16.  Tysinger has therefore failed to satisfy the third *ANR Coal* factor, and has failed to demonstrate a likelihood of success on the merits.

---

[11]     Tysinger's Stay Memorandum attached a chart, Exhibit B, purporting to show some relationship between Mr. Matthews and Pomoco Hampton.  Notably, Chrysler is entirely absent from this chart, confirming the fact that Tysinger has failed to identify or allege any relationship between Mr. Matthews and a party to the arbitration.  *See* Stay Mem. Ex. B.  Moreover, the sheer number of arrows and boxes in the chart effectively illustrates exactly how remote any connection between Mr. Matthews and Pomoco Hampton (let alone Chrysler) truly is.

Put simply, the FAA does not apply to this compulsory arbitration, and neither Section 747 nor any other statute provides this Court with authority to determine issues of arbitrator selection under Section 747.  The neutral entity tasked with making such determinations, the AAA, twice concluded that Tysinger failed to establish that Mr. Mathews was biased, and with good reason.  Tysinger has identified no relationship whatsoever between Mr. Mathews and any party to the arbitration.  Against this backdrop, Tysinger has failed to satisfy its burden of demonstrating a likelihood of success.

### 2.      Tysinger Has Not Identified Any Likely Irreparable Harm It Would Suffer

Rule 65, even if it were applicable, would obligate Tysinger to establish a "clear showing that it is likely to be ***irreparably*** harmed absent preliminary relief."  *Real Truth*, 575 F.3d at 347 (emphasis added).  "[S]imply showing some possibility of irreparable injury fails to satisfy" this requirement.  *Nken*, 129 S. Ct. at 1761; *see also Real Truth*, 575 F.3d at 347 (explicitly rejecting standard of "a possibility of irreparable injury").  Simply demonstrating some harm that is not irreparable is insufficient.  *Nken*, 129 S. Ct. at 1761.  Finally, it is not enough to show, as Tysinger suggests (Stay Mem. at 10) that the harm to the moving party without a stay outweighs the harm to the non-moving party if a stay were ordered—instead, the moving party must present facts to affirmatively satisfy its burden to show that it would be irreparably harmed.  *Real Truth*, 575 F.3d at 347; *see generally Sprinkle v. Schilling*, No. 07-CV-335, 2007 WL 2048924, at *4 (W.D. Va. July 11, 2007) (denying motion for preliminary injunction where movant failed to "allege facts indicating that he will suffer irreparable harm in the absence of injunctive relief").  Tysinger has not only misstated the applicable standard, but has entirely failed to meet it.

First, Tysinger's Stay Memorandum fails to establish that any alleged irreparable harm is likely.  Instead, the "risk of harm" alleged by Tysinger—the Stay Memorandum fails to even

address whether such harm is likely or irreparable (see Stay Mem. at 7)—is based on speculation, information and belief, not factual pleadings.  Tysinger refers vaguely to unspecified "steps to transfer the Dodge franchise" to Pomoco Hampton, and alludes to "information" it has "learned" that "leads it to believe that Chrysler Group may begin shipping Dodge vehicles to Pomoco Hampton."  Stay Mem. at 6.  Nowhere does Tysinger identify the "information" it has learned, or offer any insight into why this mysterious information has caused Tysinger to conclude that such vehicle shipments are imminent.  *Id*.  Such allusions and rank speculation are not sufficient to satisfy the stringent requirements of Rule 65.

Moreover, even if it were correct in its assumptions about the imminence of establishing a Dodge franchise with Pomoco Hampton, Tysinger has pled no facts to establish a likelihood of irreparable harm as a result.  Instead, Tysinger's allegations are pure speculation: that its injuries "***may not*** be able to be fully remedied," because an arbitrator "***may*** apply a different analysis" if Pomoco Hampton began selling Dodge vehicles, and because an arbitrator "***may*** be influenced" by Virginia law to conclude that Tysinger may no longer sell Dodge vehicles in Pomoco Hampton's market area,[12] or because unnamed "customers ***may*** begin associating Pomoco Hampton with the location for purchasing Dodge vehicles."  Stay Mem. at 10-12 (emphases added).  Tysinger presents no evidence that would show that any future arbitrator would, in any way, come to such conclusions, or that customers would in fact abandon Tysinger in favor of Pomoco Hampton.  These suggestions are purely advocacy, do not demonstrate the likelihood of irreparable harm, and should be entitled to no weight.

---

[12]   Importantly, Tysinger also contends that if its speculation is correct and the arbitrator made such conclusions, those conclusions would be contrary to Section 747.  Stay Mem. at 11.  Tysinger's alleged "irreparable harm" is, therefore, simply its speculation that another arbitrator may (by Tysinger's interpretation) mis-apply the law, an unlikely event.

Second, Tysinger's Stay Memorandum is devoid of any evidence that any such harm would be irreparable. Chrysler has always had the right and authority to enter into a sales and service agreement with Pomoco Hampton. The fact that Chrysler may decide to exercise a right it has held but not exercised does not work "irreparable harm" on Tysinger. Instead, Tysinger's Stay Motion is transparently an attempt to gain a litigation advantage—in the unlikely event that it is successful at vacating the Written Determination—to argue that it must be added to Chrysler's dealer network so that Chrysler has a dealer selling Dodge vehicles in the area. Tysinger's alleged inability to make an argument at a hypothetical (and statutorily-unavailable) future Section 747 proceeding is not irreparable harm.

Third, Tysinger's Stay Memorandum alleges economic harms that are not irreparable. Tysinger's argument that it "faces real risk to its business" if its stay is denied is self-evidently an economic injury. Stay Mem. at 10; *see also id*. at 12 (harm includes "competitive disadvantage"). Such economic harm cannot satisfy Rule 65's requirements. *See Virginia Carolina Tools, Inc. v. Int'l. Tool Supply, Inc.*, 984 F.2d 113, 120 (4th Cir. 1993) ("expenses incurred in relocation, injury to reputation, loss of profits" and other "highly speculative and largely economic injuries" were not irreparable harm); *compare Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 500 (4th Cir. 1981) (finding irreparable injury only when economic losses threatened the very existence of the business).

Finally, even if all of Tysinger's arguments about harm that would befall it if Chrysler were to enter into a Dodge sales and service agreement with Pomoco Hampton were true (they are not), staying the effect of the Written Determination would not, in any way, prevent such harm. Tysinger's Stay Memorandum suggests that the balance of interests "favors the court maintaining the status quo" by granting a stay. Stay Mem. at 10. As Tysinger well knows, the

status quo was Chrysler, a new entity with no contractual relationship to Tysinger, having the freedom to establish a Dodge sales and service agreement with Pomoco if it so chose.  As set forth above, the Written Determination did not create any rights for Chrysler, or indeed grant any relief for Chrysler whatsoever.  If Tysinger's true goal is maintenance of the "status quo," such a stay would in no way limit Chrysler's ability to enter into an agreement with Pomoco Hampton, with the resulting speculative harm to Tysinger.  If, however, this Court were to interfere with the freedom of Chrysler and Pomoco Hampton to contract for the sale and service of Dodge vehicles, it would be a radical departure from the status quo and not any form of relief authorized by granting a "stay."  *See Turner Broadcasting Sys., Inc. v. F.C.C.*, 507 U.S. 1301, 1301 (1993) (distinguishing between a "stay, which temporarily suspends judicial alteration of the status quo," and the "extraordinary relief" of an "order altering the status quo," and denying a motion for such an order).

### 3.      Chrysler Would Suffer Great Harm If Tysinger's Motion Were Granted

By contrast to Tysinger, which has identified only abstract and contingent injuries if its speculation about Chrysler's business plan is correct, Chrysler would suffer great harm if Tysinger's expansive "stay" were to be granted, and that harm outweighs any irreparable harm suffered by Tysinger.

As the Bankruptcy Court held, Chrysler's pursuit of a streamlined, consolidated dealership network is essential for the company "to compete in the automobile marketplace," and Chrysler identified "numerous advantages of having a smaller dealership network," including the "[c]onsolidation of partial line dealerships" to "eliminate redundancies and inefficiencies in the dealership network."  Opp. Ex. A at 13.  Consolidating the Chrysler, Jeep and Dodge brands in Tysinger's former market is an important part of Project Genesis, which is one of the "main

objectives" in order to achieve viability for Chrysler.  *Id*.  To the extent that Tysinger's Stay

Motion would interfere with Chrysler's ability to achieve such consolidation and pursue its

business plan, at a time that the company is just beginning to emerge from the verge of financial

collapse, it carries a very real risk of working substantial harm on Chrysler.

      Chrysler would also suffer harm resulting from such a "stay" in the form of lost

customers, as there are currently no dealers selling Dodge vehicles in the market area formerly

occupied by Tysinger.  The only way to ensure that Chrysler minimizes these injuries is by

preserving Chrysler's freedom to contract with third parties, including Pomoco Hampton, to sell

Dodge vehicles in the area again.

      **4.**     **The Public Would Be Harmed By Granting Tysinger's Purported
"Stay"**

      The public at large would also be injured by the broad and extraordinary relief sought by

Tysinger under the veil of seeking a stay.  First, customers in the area immediately surrounding

Tysinger and Pomoco Hampton would lose the prospect of a more-convenient location to

purchase Dodge vehicles.  Second, Pomoco Hampton, a third party, would be stripped, *ex parte*,

of its right to contract with Chrysler for the sale and service of Dodge vehicles.  Finally, such a

stay would interfere with Chrysler's pursuit of Project Genesis in the Hampton area.  As Mr.

Mathews found, Chrysler's inability to complete Project Genesis would jeopardize the

company's survival, and any other potential interests "are more than counterbalanced by the

huge investment in and partial ownership by the general public of Chrysler as well as the

massive effect of Chrysler's employment and other economic activity in the national economy."

Mr. Mathews concluded that "[t]he general public's interest in the survival of Chrysler as a

business enterprise is more important by several orders of magnitude" than the potential public

interests identified by Tysinger.

### III.   Conclusion

For the reasons set forth above, Chrysler respectfully requests that the Court decline to enter Tysinger's Proposed Order Granting Stay of Arbitration Award.

Dated:  August 23, 2010    CHRYSLER GROUP LLC

          By its attorneys,


          /s/_____
          Bradford Hardin (Va. Bar No. 76812)*
          Kevin C. Heffel (admitted *pro hac vice*)
          WILMER CUTLER PICKERING HALE AND DORR
          LLP
          1875 Pennsylvania Avenue, N.W.
          Washington, D.C. 20006
          Tel:  (202) 663-6000
          Fax:  (202) 663-6363
          Bradford.hardin@wilmerhale.com
          Kevin.heffel@wilmerhale.com
          *Admitted in Virginia only.  Supervised by members of
          the District of Columbia bar.

          Richard A. Johnston (*pro hac vice*)
          WILMER CUTLER PICKERING HALE AND DORR
          LLP
          60 State Street
          Boston, Massachusetts 02109
          Tel:  (617) 526-6021
          Fax:  (617) 526-5000
          Richard.johnston@wilmerhale.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 23th day of August 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to the following counsel of record:

Christine A. Williams
Wyatt B. Durrette, Jr.
DurretteBradshaw PLC
600 E Main St
20th Floor
Richmond, VA 23219
(804) 775-6900
cwilliams@durrettebradshaw.com
wdurrette@durrettebradshaw.com

Kevin Jermone Funk
Cantor Arkema PC
1111 E Main St
PO Box 561
Richmond, VA 23218-0561
(804) 644-1400
kfunk@durrettebradshaw.com

/s/_____
Bradford Hardin (Va. Bar No. 76812)
WILMER CUTLER PICKERING HALE AND
DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel:  (202) 663-6000
Fax:  (202) 663-6363
Bradford.hardin@wilmerhale.com